**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TIFFANY A. KILLEN,**

        **Plaintiff,**

                                            **Civil Action 2:16-cv-992**

    **v.**                                      **JUDGE GEORGE C. SMITH**

                                            **Magistrate Judge Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

<u>**OPINION AND ORDER**</u>

Plaintiff, Tiffany A. Killen,[1] brings this action under 42 U.S.C. § 405(g) for review of a

final decision of the Commissioner of Social Security ("Commissioner") denying her application

for Social Security Supplemental Security Income benefits ("SSI"). This matter is before the

Court for consideration of Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's

Memorandum in Opposition (ECF No. 16), Plaintiff's Reply (ECF No. 17), and the administrative

record (ECF No. 8). For the reasons that follow, the Court **REVERSES** the decision of the

Commissioner and **REMANDS** this action under Sentence Four of § 405(g).

**I.      BACKGROUND**

Plaintiff protectively filed her application for benefits in August 2013, alleging that she has

been disabled since April 1, 2003. (R. at 135–40.)[2] Plaintiff's application was denied initially and

upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. (R.

---

[1] Plaintiff's maiden name, which appears on some of the case filings, is "Largent." (R. at 135.)
[2] Plaintiff previously filed claims for disability benefits in 2006, 2009, and 2012. (R. at 66.)
The applications in 2006 and 2012 did not go past the reconsideration level and the 2009
application was dismissed for abandonment at the hearing. (*Id.*).

at 106–08.)   Administrative Law Judge Jason C. Earnhart ("ALJ") held a hearing on September 21, 2015, at which Plaintiff, who was represented by counsel, appeared and testified.   (R. at 37–56.)   On November 25, 2015, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.   (R. at 13–24.)   On August 22, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.   (R. at 1–6.) Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY[3]

### A.   Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that she was recently married and lived with her new husband and her two boys from prior relationships, ages ten and five years old.   (R. at 37–38, 49–50.)   Plaintiff testified she took special classes in school and that she left in the 10th grade when she was eighteen years old because "[i]t got too hard."   (R. at 38–39.)   She cannot read the newspaper or help her ten-year-old son with his homework.   (R. at 39.)   She obtained her drivers' license by taking the audio version of the driver's test.   (*Id.*).   She lost her last job as a cashier around 2003 because she could not count money.   (R. at 40.)   She is depressed and has crying spells often.   (R. at 41.)   Her depression affects her ability to work because she becomes temperamental and does not get along with others or her family.   (R. at 41–42.)

When asked about her vision loss, Plaintiff testified that she can only see shadows out of her right eye and has perfect vision in her left eye so it does not affect her ability to drive.   (R. at 42.)   She began taking medication for migraines eight months prior to the hearing, which is effective.   (*Id.*).

---

[3] The Court limits its analysis of the evidence and the administrative decision to the issues raised in the Statement of Errors.

She spends a typical day getting her boys off to school, doing laundry, cooking and watching television. (R. at 44–45.) She does no yard work. (R. at 45.) She will grocery shop with her husband but not by herself. (*Id.*) She does not go anywhere by herself and denied having any hobbies. (R. at 46.) Her mother read all the mail, including mail regarding Plaintiff's disability application. (*Id.*). Plaintiff admitted she cannot tell if she is receiving the correct change back at a store. (R. at 47.) She has no problems or issues with personal grooming. (*Id.*).

## B.     Vocational Expert Testimony

George W. Coleman III testified as the vocational expert ("VE") at the administrative hearing. (R. at 56–60.) The VE classified Plaintiff's past relevant work as a cashier, a light exertion, unskilled job. (R. at 56–57.) The ALJ proposed a hypothetical regarding Plaintiff's residual functional capacity ("RFC") to the VE that included no exertional limitations, but she is limited to never climbing ladders, ropes, and scaffolds; never being exposed to hazards such as moving mechanical parts and unprotected heights; never operating a commercial motor vehicle. (R. at 57.) The hypothetical individual could not have any jobs requiring depth perception or objects approaching from the right side or any work that required precise vision; limited to simple, routine, repetitive tasks with no fast production pace or close consistent concentration with occasional interaction with supervisor, co-workers, but never the public; occasional changes in the work setting that are routine and explained in advance; and further limited to moderate noise with no interaction with the public. (R. at 57–58.) Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could not perform her past relevant work but could perform 87,820 medium, unskilled jobs in the national economy, such as a prep cook/cook helper, or linen room attendant; and 502,730 light, unskilled

jobs in the national economy, such as a motel housekeeper, or cafeteria attendant. (R. at 23, 58–59.) The VE further testified that it would be acceptable in an unskilled work setting to be redirected in the job task for one to two times per day. (R. at 59–60.) The VE also testified that Plaintiff could be off task 20 percent of the day or absent more than one day per month, but excess of that is not competitive substantial gainful activity level. (R. at 60.)

### III.     MEDICAL RECORDS

#### A.     Logan Elm Local Schools

Plaintiff underwent a Multifactored Evaluation in April 1999, when she was in the 8th grade. (R. at 237–50.)[4] When discussing her background, the school psychologist noted that "[f]requent moves during her first five years of school are considered significant." (R. at 238.) The evaluation reflected a reading composite score of 55 and math composite score of 70. (R. at 240.) Plaintiff's poor decoding skills appear to interfere with her ability to read fluently beyond 3rd grade readability context. (*Id*.).

The school psychologist noted that Plaintiff's previous assessments from April 1996, when she was 13 years old, showed her cognitive ability in verbal reasoning measured at 81; abstract/visual reasoning at 110; quantitative reasoning at 82; short term memory at 96; and test composite at 88. (R. at 241.)[5] The scores fell in the upper limit of the "low average" range. (*Id*.). The school psychologist also noted that although Plaintiff's I.Q. results fall within "low average" range, her verbal reasoning and vocabulary are likely to affect adversely her

---

[4] It appears that the evaluation was performed on April 1, 1999, just before her sixteenth birthday on April 5. (*Id*.).
[5] These records refer to a full-scale score of 88 in both 1996 and 1999. (R. at 241, 246.) It is unclear whether the I.Q. test with those results was administered in 1999, or rather, the 1999 assessment incorporated the 1996 results. (*Id*.).

comprehension of written tests, spoken information, or other information of an abstract nature. (*Id*.).

Plaintiff's Individualized Education Program ("IEP") effective for Plaintiff's 11th grade school year 2001–2002 noted Plaintiff was on a 5th grade level in math and 4th grade reading level. (R. at 215.) She can write complete sentences and paragraphs but has problems with spelling. It was noted "[s]he missed way too much school. She does well when she is in school. [Plaintiff] has failed several classes because of attendance." (R. at 215.)

Plaintiff completed all of the 12 Skill Assessment Modules (SAM) for hands-on Assessment when she was 17 years old. At that time, Plaintiff was a 10th grader in the learning disabled program. Her score in manual dexterity (pipe assembly) was in the superior range at 92.98 percentile. Scores in the average to above average range were digital discrimination (mail sort) 55.81 percentile, clerical/verbal (alphabetizing) 47.57 percentile, motor coordination (maze) 52.13 percentile, finger dexterity (screwdriver) 64.98 percentile, form perception (0-rings) 82.72 percentile, spatial perception (blocks) 69.13 percentile, color discrimination (color circle) 54.73 percentile, and follows diagram instructions (circuit board) 75.44 percentile. Problem areas were aiming (tweezers) 12.74 percentile, measurement skills (ruler) 18.28 percentile, follows written instructions (memo) 26.2 percentile, and clerical/numerical (payroll) 29.57 percentile. Her overall score was a solid 52.48 percentile. The vocational evaluator recommended that Plaintiff chose Early Childhood Education, Cosmetology, and Diversified Health Occupations as the programs she likes best. These programs are all included in her highest interest cluster and would be appropriate in that regard. The evaluator also recommended that Plaintiff practice exercises to help improve her weaker functional skills. (R. at 235–36.)

### A.    2006 Consultative Examination

Plaintiff attended a consultative evaluation on April 18, 2006 ("the 2006 report"), stemming from one of her prior applications for benefits.  (R. at 260–65.)  On September 30, 2006, Plaintiff's counsel submitted the 2006 report following the administrative hearing but prior to the ALJ issuing his decision.  (R. at 256–57.)  The record is unclear as to who conducted the examination and authored the 2006 report.  In her letter dated September 30, 2006, Plaintiff's counsel states that John S. Reece, Psy.D. performed the examination and authored the 2006 report.  (*Id*.).  Notably, Dr. Reece's signature appears at the end of the 2006 report.  (R. at 264.)  However, T. Rodney Swearingen, Ph.D.'s name appears at the top of the first page of the 2006 report (R. at 260) and the state-agency reviewing physicians refer to the 2006 report as authored by Dr. Swearingen (R. at 69, 73, 86, 89, 95).

On April 18, 2006, psychometric testing was performed, which resulted in a verbal I.Q. score of 68, performance I.Q. score of 73, and full scale I.Q. score of 67.  (R. at 262–63.)  Her verbal and full scale scores fell in the extremely low range while her performance I.Q. score fell in the borderline range.  (R. at 263.)  Plaintiff's verbal comprehension, expression, and reasoning skills were extremely low.  (*Id*.).  Her immediate, general, and working memory indexes fell in the extremely low range with impaired capacity to remember and manipulate both visually and orally presented information in short term memory storage.  (*Id*.).  Plaintiff was diagnosed with major depressive disorder, recurrent, mild; posttraumatic stress disorder; and borderline intellectual functioning.  (*Id*.).  Plaintiff is able to live independently with adequate adaptive behaviors.  (R. at 264.)  Plaintiff's ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks is not impaired.  (*Id*.).  She displayed no problems of

6

sustained concentration and persistence and her pace was moderate. (*Id.*). Plaintiff's ability to understand, remember and follow instructions is moderately impaired by low cognitive functioning. (*Id.*). She stated that she has some problems following direction because of being a slow learner. (*Id.*). She exhibited some memory and comprehension problems on the day of examination. (*Id.*). Plaintiff's mental ability to withstand the stress and pressures associated with daily work activity was markedly impaired by her depression, anxiety, low self-esteem, and poor energy level. (*Id.*).

### C. James C. Tanley, Ph.D.

On November 15, 2013, James C. Tanley, Ph.D., a clinical psychologist and neuropsychologist, performed a consultative evaluation for disability purposes. (R. at 282–86.) Plaintiff reported that it was her mother's idea to apply for disability. (R. at 282.) She also reported that she suffers depression but does not receive treatment because she has no babysitter. (*Id.*). Plaintiff attended tenth grade, but reported that she was a slow learner, flunked twice, and dropped out of school because she was tired of getting made fun of by others. (R. at 283.) Plaintiff had three jobs and was fired from all of them. (*Id.*). She reported that she usually does not go around other people and stays home. (*Id.*). Plaintiff reported that she was molested by her father from ages three to five and had current nightmares that feel like she is reliving the situation. (R. at 284.) She was psychiatrically hospitalized once four years prior to this evaluation for being suicidal. (R. at 283.)

Dr. Tanley found Plaintiff was generally cooperative, demonstrating no eccentricities of manner, impulsivity, or compulsivity. (R. at 284.) Her grooming, posture, gait and general motor behavior were all unremarkable. (*Id.*). Plaintiff's affect was appropriate to thought

content, but her eye contact was variable. (*Id.*). Dr. Tanley found Plaintiff's thoughts were coherent, relevant, and goal oriented. (*Id.*). Dr. Tanley estimated her current level of intellectual functioning in the borderline range. (*Id.*).

At the time of this evaluation, Plaintiff was not under any psychiatric treatment or taking any psychotropic medication. (R. at 285.) Dr. Tanley did not perform any testing. (*Id.*). He diagnosed major depressive disorder, recurrent type, severe severity; post-traumatic stress disorder; and intellectual disability, mild severity. (*Id.*). Dr. Tanley concluded that Plaintiff had no difficulty understanding the task requirement of the examination and estimated her intellect to be in the borderline range, which is what would be expected of her in a work setting. (R. at 286.) Her ability to maintain attention and concentration and ability to maintain persistence and pace to perform simple tasks and to perform multistep tasks were unimpaired. (*Id.*). Dr. Tanley did note that Plaintiff would be a risk for dealing with the public and she would be risk for trying to deal with workplace stresses and pressure. (*Id.*).

### D. State agency review

In November 2013, Bonnie Katz, Ph.D., reviewed the medical record and assessed Plaintiff's mental condition. (R. at 65–78.) Under "Evidence of Record," Dr. Katz reviewed, *inter alia*, records from Scioto Paint Valley Mental Health Center, records from Dr. Tanley, a June 2012 report from Dr. Swearingen, and an April 2006 report from Dr. Swearingen. (R. at 67–69.) Dr. Katz assigned "great weight" to Dr. Tanley. (R. at 73.) She assigned "[s]ome partial weight" to Dr. Swearingen, noting that "the exams were done several years ago." (*Id.*).

Dr. Katz diagnosed Plaintiff with affective disorders and an intellectual disability and considered Listings 12.04 (organic disorders) and 12.02 (organic mental disorders). (R. at 71–

72.)   Dr. Katz found that Plaintiff had mild restrictions of activities of daily living; moderate

difficulties in maintaining social functioning and in maintaining concentration, persistence, or

pace; and no episodes of decompensation.   (R. at 72.)   Dr. Katz also found that the evidence did

not establish the presence of the "Part C" criteria.   (*Id.*).   Dr. Katz noted that Plaintiff's

allegations were partially credible, noting that Plaintiff's medically determined impairments could

reasonably be expected to produce the alleged symptoms, but that the intensity of the symptoms

and their impact on functioning are not consistent with the totality of the evidence.   (R. at 73.)

Dr. Katz noted that Plaintiff does not receive psychiatric treatment, she is able to care for her kids,

and do household chores.   (*Id.*).   As to Plaintiff's mental residual functional capacity assessment

("MRFC"),[6] Dr. Katz determined that Plaintiff would have difficulty understanding, remembering

and carrying out moderately complex instructions but is able to remember simple tasks.   (R. at

76.)   Plaintiff is able to maintain attention and concentration for carrying out simple tasks that do

not require her to sustain close consistent attention and concentration over an extended period, nor

require her to meet fast-paced performance standards.   (R. at 77.)   She is able to interact with

others for brief and superficial interactions and is able to adjust to normal work stressors and

infrequent changes in routine that are introduced in advance and explained fully.   (*Id.*).

In March 2014, state-agency psychologist, Carl Tishler, Ph.D., reviewed the mental health

evidence upon reconsideration and affirmed Dr. Katz's assessment.   (R. at 82–94.)

## IV.        ADMINISTRATIVE DECISION

On November 25, 2015, ALJ Earnhart issued his decision.   (R. at 13–24.)   Applying the five-step

sequential evaluation process,[7] the ALJ first found that Plaintiff had not engaged in substantial

---

[6]" MRFC" is an residual functional capacity which limits its consideration to mental capabilities.
[7]Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.   *See* 20 C.F.R. § 416.920(a)(4).   Although a dispositive

gainful activity since August 20, 2013, the application date. (R. at 15.) Next, the ALJ found that Plaintiff's severe impairments included vision loss/partial blindness in the right eye, bipolar disorder, depressive disorder, post-traumatic stress disorder, borderline intellectual functioning, and migraines. (*Id.*). The ALJ concluded, however, that Plaintiff's complaints of chest pain have not been attributed to an underlying medically determined impairment. (*Id.*). The ALJ also found that Plaintiff's rash symptoms are well controlled and that Plaintiff is responding well to treatment. (*Id.*). At the third step, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16–18.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes or scaffolds, never be exposed to hazards such as moving mechanical parts and unprotected heights, and never operate a commercial motor vehicle. Furthermore, the claimant can never have any jobs requiring depth perception, objects approaching from the right side, or any work that requires precise vision. Further, the claimant is limited to simple, routine, repetitive tasks, with no fast production pace or close consistent concentration. She can have occasionally interaction with coworkers, supervisors but never the public,

---

finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

occasional changes in the work setting that are routine and explained in advanced and further limited to moderate noise.

(R. at 18.)   In reaching this determination, the ALJ gave "great weight" to the opinions of the state agency psychologists, Dr. Katz and Dr. Tishler, finding that Plaintiff was on medication for her bipolar disorder and depression, which indicates that her symptoms are well controlled. (R. at 21–22.)   The ALJ also noted that, at the time of decision, Plaintiff was not seeking any counseling or psychiatric care.   (R. at 21.)   The ALJ assigned "some" weight to the opinion of consultative examiner, Dr. Tanley.   (R. at 22.)   The ALJ determined that due to Plaintiff's history of depression and psychoactive medication, her ability to maintain attention is impaired even though she was able to stay on task during the consultative examination.   (*Id*.).   The ALJ further determined that the RFC takes into account such symptoms by limiting Plaintiff to unskilled-type work.   (*Id*.).   The ALJ found that Dr. Tanley's opinion is otherwise consistent with Dr. Katz and Dr. Tishler's opinions.   (*Id*.).

Relying on the VE's testimony, the ALJ concluded that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R. at 23.)   He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 24.)

## V.     STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"   *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").   Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.   The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.   *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).   Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"   *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"   *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.        ANALYSIS

In her Statement of Errors, Plaintiff advances three contentions of error.   The Court finds Plaintiff's first contention of error, that the ALJ relied on evidence that was not included in the record and, therefore, his decision was not supported by substantial evidence, to be well taken.[8]

---

[8] This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the Court need not, and does not, resolve these alternative bases that Plaintiff asserts support reversal and remand.   Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error, if appropriate.

"Social security proceedings, unlike judicial ones, are inquisitorial, not adversarial."

*Wright–Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 397 (6th Cir. 2010) (citing *Sims v. Apfel*, 530

U.S. 103, 110–11 (2000)).   Generally, "[t]he burden of providing a complete record, defined as

evidence complete and detailed enough to enable the Secretary to make a disability determination,

rests with the claimant."   *Landsaw v. Sec'y Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.

1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)).   However, "the ultimately responsibility for

ensuring that every claimant receives a full and fair hearing lies with the administrative law

judge."   *Lashley v. Sec'y of Heath and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983).   "The

ALJ's duty [to ensure that every claimant receives a "full and fair hearing" and to develop the facts

upon which her decision rests] applies in every case, regardless of whether or not the claimant is

represented by legal counsel."   *Gibson v. Comm'r of Soc. Sec.*, No. 1:13-cv-069, 2014 WL

619135, at *5 (S.D. Ohio Feb. 18, 2014); *see also Bennett v. Colvin*, No. 3:15-cv-00302, 2016 WL

308777, at *5 (N.D. Ohio Jan. 26, 2016) ("Even though the ALJ did not have a *heightened* duty to

develop the record . . . , she still had a duty to ensure that a reasonable record was developed.")

(emphasis in original).   A failure to fully develop the factual record is usually found "where the

ALJ conducted only superficial or perfunctory questioning, as well as in cases where the ALJ

failed to obtain all available medical records and documentation."   *Brewer v. Comm'r of Soc.

Sec.*, No. 5:16-cv-137, 2016 WL 7634431, at *10 (N.D. Ohio Dec. 12, 2016) (citations omitted),

*adopted by* 2017 WL 27260 (Jan. 3, 2017).

Here, Plaintiff contends that the ALJ's decision is unsupported by substantial evidence

because the ALJ excluded evidence from the record, namely, the 2006 report.   (ECF No. 11 at 5–

9.)   Plaintiff notes that the state agency consultants referred to the 2006 report and that the ALJ

and Plaintiff's prior representative discussed at the administrative hearing the significance of the 2006 report and whether it may be admitted into the record. (*Id*. at 6–7 (citing R. at 33–36)).

On September 30, 2015, Plaintiff's former counsel submitted the 2006 report that reflected a full I.Q. score of 67 and records from Logan Elm Local Schools that refer to 1996 I.Q. testing to the ALJ for consideration in her present claim. (R. at 256–57, 260–65.) In his decision issued on November 25, 2015, the ALJ refused to consider the 2006 report. (R. at 18.) Plaintiff contends that the ALJ erred when he refused to consider the 2006 report.

This Court agrees. Plaintiff's claim is based, in part, on intellectual disability. Listing 12.05 covers the impairments related to intellectual disability. Specifically, as applicable to Plaintiff, Listing 12.05 stated:

> Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirement in A, B, C, or D are satisfied.

> \* \* \*

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05(C).

20 C.F.R. 404, Subpt. P, App. 1 § 12.05. Accordingly, to meet the requirements of 12.05(C), Plaintiff must show an "onset of the significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22." *Foster v. Halter*, 279 F.3d 348, 354–55 (6th Cir. 2001) (internal quotations omitted). Additionally, Plaintiff must demonstrate a valid verbal, performance, or full scale I.Q. score that meets the Listings requirement ranges. *See Turner v. Comm'r of Soc. Sec.*, No. 09-5543, 2010 WL 2294531 at \*3 (6th Cir. 2010).

14

To satisfy the diagnostic description, a claimant must demonstrate three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009). A claimant may meet the onset requirement either directly or circumstantially. Specifically, the Sixth Circuit has found that "[w]hile the claimant may use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period . . . a claimant is by no means required to produce an IQ score obtained prior to age 22." *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 699 (6th Cir. 2007).

"The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes*, 357 F. App'x at 677. Although Listing 12.05 does not define "adaptive functioning," another portion of the Listings defines "adaptive activities" as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(1). Furthermore, in considering Listing 12.05 the Sixth Circuit has noted "[t]he American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Id.* (quoting DSM-IV-TR at 49).

Here, the record reflects I.Q. scores from the 2006 report and from testing administered in 1996 and referred to in school records. First, the 2006 report, which was prepared in connection with an earlier application that was dismissed as abandoned, reflected a full-scale I.Q. score of 67, which would support a finding of disability under Listing 12.05(C). (R. at 260–65.) The 2006

15

report also contained a diagnosis of, among other things, borderline intellectual functioning ("BIF"). (*Id.*) While the 2006 report was not included in the official administrative record of this current application, Dr. Tanley, who performed a consultative exam in connection with Plaintiff's current application, considered the 2006 report in 2013, and did not administer his own I.Q. test. (R. at 282, 285.) The state-agency reviewing psychologists also considered the 2006 report in connection with the current application. (R. at 69, 71, 73, 85–86, 89.) The reviewing psychologists, however, did not consider Listing 12.05(C). (R. at 71–72, 88.) Second, the Logan Elm Local Schools, which are included in this administrative record, refer to I.Q. testing administered in 1996.[9] (R. at 237–50.) The 1996 I.Q. testing revealed a full-scale score of 88, which would not satisfy Listing 12.05(C). (*Id.*) The state-agency psychologists and the ALJ expressly considered the 1996 I.Q. score. (R. at 18, 71, 92.)

At the administrative hearing demonstrates, the ALJ conceded that the 2006 report reflecting a full IQ score of 67 was relevant and asked if there was a way to admit it into the record:

> ALJ: I just find it -- found it interesting when I was reviewing this case. Sometimes I'm not always sure my notes are correct, you know, in doing so many, you know, in fairness to myself. But that was a note that I took for my hearing notes today. Prior case abandoned. I don't know how we get -- is there a way to get that score into the record here in this case?

> ATTY : It should be out there somewhere. I don't know how Dr. Tanley had access to that.

> ALJ: I don't either. I don't either. I mean, it was a—is it the fact that it's—the—I want to try something real quick. Okay. Ma'am, is it okay if I look at your prior folder for one second?

> CLMT: Yes .

> ALJ : From your prior case?

---

[9] As previously noted, it is unclear if the 1999 assessment simply incorporated the 1996 results. In any event, the full-scale score was 88. (R. at 241, 246.)

16

ATTY: Sure.

ALJ: Okay. So, I have a C.E. [consultative examination] at 2F of the prior case that Dr. Swearingen [phonetic] did April 18th of 2006. In a moment here, I'm going to have to restart this, I think, to get it -- see if I can get the image actually to come up. That has to be what they're referring to.

(R. at 35.)

ALJ: Is there a way for you to get that put into the record in this case? Is that under the rules? Ah.

ATTY: I mean, if it's out there, I think it should be included. Sometimes they include records from the prior case, and I think the fact that he –

ALJ: He's talking about it in here.

ATTY: -- discussed it. It's definitely relevant. And I guess you could argue that his report, which referenced that and maybe put eyes on it a little bit, would you consider new and material evidence. That may be bound by that prior denial.

ALJ: I don't know. I mean, I'm -- the reason that it got my attention was the fact that it was referenced in the information from this year. Obviously, I'm looking at it right now. Verbal I.Q. of 68. Full-scale of 67. Extremely low range. All right. Well, let's do the hearing. And we'll think about some other things here after the hearing's over maybe. Counselor, I'm going to let you have the witness first on this one.

(R. at 36.)

ATTY: Your honor, I think it's clear from the evidence and the testimony that her anxiety as shown today, as well as her depression would simply make it not possible for her to go to work eight hours a day, five days a week. And then, of course there is the l2.05c issue if we can get that those I.Q. scores, which, again, I think her testimony today would show that those are valid I.Q. scores. I don't think they've been questioned. I'm not sure why Dr. Swearingen diagnosed borderline intellectual functioning, but I haven't read his reports. So.

ALJ: No. And nor have I. I've merely just seen the exhibits that were put into this file.

ATTY: Right.

(R. at 61.)

ALJ: And I'm going to take a look. If you believe there's a way to bring those exhibits in, I certainly would let you do that. I'm going to check on my end –

ATTY: Yes.

ALJ: -- and see what the protocol is on our end with how everything relates on an abandonment case. So, what we're allowed to look and what we're not. I'll get some – I'm going to get some direction on that, myself. Take the matter under advisement from there. One way of the other, I want to make sure that any stone that's to be unturned has been turned if it's allowed to be that way, I guess. Fair enough way to say it. But as far as any evidence from this current period of time, we're good. We've got everything. Okay. So, I will certainly allow, you know, any consideration of that previous I.Q. score to the extent that it's allowed. I'm going to check with the senior attorney right now and see what I'm allowed to do. So, that being said, I'm going to take the matter under advisement from here.

(R. at 62.)

Although Plaintiff's former counsel submitted the 2006 report to the ALJ on September 30, 2015 (R. at 256–57, 260–65), the ALJ declined to consider the 2006 report when he issued his decision on November 25, 2015, and concluded she did not meet Listing 12.05(C), reasoning as follows:

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The undersigned notes that there was a consultative examination conducted in 2006 from the claimant's previous file where the consultative examiner concluded that the claimant's full scale IQ was 67. However, the undersigned will not consider the previous consultative examination report in evaluating this case. The previous consultative examination report was considered in a previous unfavorable determination on April 18, 2006 that found the claimant did not meet listing-level severity. That previous decision is administratively final and the undersigned finds no basis to reopen that decision. The claimant had a verbal IQ of 81, performance IQ of 82 and full scale IQ of 88 per her mental assessment test results in 1996. Accordingly, the paragraph "C" criteria of listing 12.05 are not met.

(R. at 18.)

Based on this record, the Court concludes that remand is warranted because the ALJ failed to fully develop the record by refusing to consider the 2006 report. *See Lashley*, 708 F.2d at 1051; *Gibson*, 2014 WL 619135, at *5; *Sutton v. Comm'r of Soc. Sec.*, No. 12-11043, 2013 WL 1122877, at *2 (E.D. Mich. Mar. 18, 2013) ("'An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing.'") (quoting *Figard v. Comm'r of Soc. Sec.*, No. 1:09-cv-425, 2010 WL 3891211, at *7 (W.D. Mich. July 1, 2010)). While the Commissioner insists that "Plaintiff, not the ALJ, holds the burden to produce evidence in support of a disability claim" (ECF No. 16 at 7), the Court finds that Plaintiff met her burden of production when her representative submitted the 2006 report to the ALJ on September 30, 2015, before the ALJ issued his decision on November 25, 2015. As set forth above, the ALJ conceded at the administrative hearing that the 2006 report, which contained the full-scale I.Q. score of 67, was relevant. The ALJ nevertheless refused to consider the 2006 report and failed to adequately explain why he did not do so. He stated that the 2006 report was considered in a previous unfavorable determination and that the "previous decision is administratively final and the undersigned finds no basis to reopen that decision." (R. at 18.) Plaintiff, however, did not seek to reopen her previous claim;[10] she argues only that admittedly relevant evidence be admitted and considered in connection with this claim. (ECF Nos. 11, 16.) In addition, as set forth above, the state-agency reviewing psychologists considered the 2006 report. The ALJ, who had to, and did, evaluate those experts' opinions, should have had before him all the materials upon which those experts based their opinions. *See Lashley*, 708 F.2d at 1051; *Gibson*, 2014 WL 619135, at *5; *Sutton*, 2013 WL 1122877, at *2.

---

[10]On a related note, Plaintiff's 2006 and 2012 applications did not go past the reconsideration level and the 2009 application was dismissed for abandonment at the hearing (R. at 66) and, therefore administrative *res judicata* does not apply. *See Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 840–42 (6th Cir. 1997).

Moreover, as Plaintiff notes, the 1996 I.Q. scores, which were admitted into the record, relate to an earlier period and pre-date the I.Q. scores in the 2006 report. Notably, the 1996 scores upon which the ALJ relied when finding that Plaintiff did not meet Listing 12.05(C) are invalid. "IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 112.00(D)(10). This reasoning behind this is as follows:

> At least part of the reasoning behind these standards is that "[t]est results obtained at younger ages are less reliable and valid than test results obtained at older ages." Program Operations Manual System ("POMS") § DI 24515.055(A). The Commissioner argues that although the foregoing regulation is found solely within the listings for children under 18, it still applies to claims under the adult listings. (Doc. #20 at 3-4). This argument makes good sense; if a child's IQ score is deemed too unreliable to be "valid" for more than two years when reviewing the record against a listing for children, it would be illogical to find the same test score of value (or "valid") in reviewing the record against the adult version of the same listing many years later. The Sixth Circuit has agreed with this reasoning. *See Crum v. Comm'r. of Soc. Sec*., 660 Fed. Appx. 449, 455 (6th Cir. 2016) (finding that in reviewing disability application of twenty-two year old claimant, IQ tests taken when claimant was younger than sixteen years old were "valid only for two years."). *See also Higgins v. Barnhart*, 42 Fed. Appx. 846, 850 (7th Cir. 2002) ("because Higgins was younger than 16 when she took the 1987 IQ test, the results were diagnostically valid only for two years ...").

*Walker v. Comm'r of Soc. Sec*., No. 16-10669, 2017 WL 4019455, at *5 (E.D. Mich. July 27, 2017), *adopted by* 2017 WL 4011024 (E.D. Mich. Sept. 12, 2017). Here, Plaintiff's 1996 scores, which included a full-scale score of 88, were obtained when she was thirteen years old (R. at 241) and are therefore invalid. *Id*.[11]

The Commissioner nevertheless implies that the exclusion of the 2006 report is harmless, insisting that even if the ALJ admitted the 2006 report and considered the qualifying I.Q. score of 67, Plaintiff's adaptive functioning did not meet or medically equal Listing 12.05(C). (ECF No.

---

[11] The same result applies if the test was administered in 1999, because the results—a full-scale score of 88—were obtained before she was sixteen years old. *Id*.

16 at 4–6.) This Court disagrees. The failure to admit the I.Q. scores in the 2006 report is not

harmless. The state-agency reviewing psychologists, who considered the 2006 report, did not

evaluate Plaintiff's claim by reference to Listing 12.05(C). (R. at 65–97.) In addition, the ALJ

found that Plaintiff did not meet Listing 12.05(C) only because the record did not contain

qualifying I.Q. scores. (R. at 18.) In other words, he did not consider whether she met the other

requirements of this Listing. (*Id.*) Although the Commissioner might find, after considering the

scores in the 2006 report, that Plaintiff's mental impairment does not meet Listing 12.05(C), that

determination should be made, in the first instance, by the Commissioner and not by this Court.

*See Russell v. Comm'r of Soc. Sec.*, No. 2:15-cv-407, 2016 WL 1103897, at *6 (S.D. Ohio Mar. 22,

2016) ("Although the Commissioner argues that the ALJ's determination should be upheld

because the record evidence elsewhere does not establish that Russell's impairment[s] satisfied the

criteria for Listing 12.05C, 'the ALJ included no such analysis in the decision," and this Court

"cannot engage in *post hoc* rationalizations.'") (citations omitted); *Coates v. Colvin,* No.

12-cv-13900, 2013 WL 12123667, at *3 (E.D. Mich. Nov. 27, 2013) ("'It is not for the [Judge] to

step into the shoes of the ALJ and complete his job for him. The ALJ should, in the first analysis,

assess whether the evidence put forth shows that Plaintiff meets or equals a Listing.'") (quoting

*Risner v. Comm'r of Soc. Sec.*, No. 1:11-cv-036, 2012 WL 893882, at *5 (S.D. Ohio Mar. 15,

2012)).

## VII.     CONCLUSION

In sum, due to the ALJ's failure to sufficiently develop the record, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g).   *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (where the remand directs the ALJ "to cure some specific defect in the administrative proceeding, such as the ALJ's failure to develop the record or properly evaluate the evidence . . . the district court should [ ] remand[ ] the case pursuant to sentence four, rather than sentence six, of 42 U.S.C. § 405(g)"). Accordingly, the Court **REVERSES** the decision of the Commissioner and **REMANDS** this action under Sentence Four of § 405(g) for further consideration consistent with this Opinion and Order.

**IT IS SO ORDERED.**

    *s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**